# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

George Hamilton,

    Plaintiff,

v.                                            Case No. 1:06cv409

William Eleby, *et al.*,                Judge Michael R. Barrett

    Defendants.

## OPINION & ORDER

This matter is before the Court upon Defendants William Eleby and Jack Bendolph's Motion for Summary Judgment (Doc. 37); Plaintiff George Hamilton's Memorandum in Opposition (Doc. 43); and Defendants' Reply (Doc. 45).

## I.    BACKGROUND

In September of 2003, Plaintiff George Hamilton was incarcerated at Ross Correctional Institution ("RCI") in Chillicothe, Ohio. (Doc. 40, George Hamilton Depo. at 11-12) In November of 2003, Hamilton was sent a threatening letter signed with two lighting bolts, which is the classic insignia of the Aryan Brotherhood, a prison gang. (Doc. 37, William Bendolph Depo., Ex. A at 85)[1] Hamilton first learned about the hit on his life from his ex-girlfriend Paula Creamens, the sister of two known Aryan Brotherhood members, Daryl and Jesse Bocook. (Hamilton Depo. at 14-15) The RCI staff initiated a

---

[1]The letter read:

We knew you been back there for a while It's just a matter of time before we get you. You slip threw our hands before, Porky But it's a small world isn't it? You are a walking ghost, will see you soon won't be long. Stop asking Questions about us. They tell us you're a dead man walking.

Protective Control ("PC") referral. (Doc. 41, Pat Hurley Depo. at 23-25) PC allows inmates to be separated from the general population for their own safety. In his request for PC, Hamilton explained that the Aryan Brotherhood planned to kill him because the state had removed documents from his cell and used them in the prosecution of Daryl Bocook for the murder of Hamilton's friend, Sam Huffman. (Bendolph Depo., Ex. A at 86) Hamilton also explained that Daryl Bocook had passed the information on to all of the Aryan Brotherhood. (Id.) Hamilton explained that the Aryan Brotherhood members had previously "broke [his] face" while he was at Belmont prison and tried to stab him "5 or so time[s]." (Id.)

The PC Committee conducted an investigation, and found that Hamilton had already been granted institutional separation from Daryl and Jesse Bocook, which meant that he was not to be placed in the same institution as either Bocook. (Id. at 83) The PC Committee verified that Sam Huffman was the victim of Daryl Bocook's crime. (Id.) The PC Committee verified that Paula Cremeans is an approved visitor as a sister on Daryl and Jesse Bocooks visiting lists. (Id.) The PC Committee also found that Paula Cremeans was an approved visitor on Hamilton's list as a friend, and a Request for Modification to Visiting List completed by Hamilton in March of 2000 states that she is a girlfriend. (Id.) The PC Committee was unable to verify whether Hamilton had received a broken jaw while he was housed at Belmont Correctional Institution because the records were not available. (Id.)

The PC committee recommended that Hamilton be put in PC. (Id. at 82) Pat Hurley, the warden at RCI, agreed with the findings, and approved PC placement. (Id. at 81) Hurley's recommendation was submitted to the Bureau of Classification in the Ohio Department of Rehabilitation and Correction.

The Bureau of Classification denied PC placement, and instead approved transfer

to another Level 3 facility. (Bendolph Depo., Ex. A at 74) This decision was made by Defendant Jack Bendolph, who is an assistant to Defendant William Eleby, the Director of the Bureau of Classifications. Eleby had delegated the authority to make PC determinations to Bendolph and another staff member. (Bendolph Depo. at 67-68) Eleby did not review Hamilton's request. (Doc. 39, William Eleby Depo. at 44-45) Instead, Bendolph reviewed the letter, the findings of the PC Committee, and the warden's approval of PC placement. (Bendolph Depo. at 79-80) Bendolph was also aware of the Aryan Brotherhood's history of violence, and knew that gangs could retaliate by assaulting or killing a prisoner. (Id. at 49-50, 54)

Bendolph denied Hamilton PC placement because: (1) the Bocook brothers were not incarcerated at WCI; (2) while Hamilton claimed to be in fear of the Bocook brothers, he had continuously maintained their sister, Paula Cremeans, on his inmate visiting list; and (3) the PC Committee's report stated: "It is the belief of staff in the RCI investigator's office that Inmate Hamilton wrote the [threatening] letter and sent it to himself." Bendolph determined that Hamilton "had a problem at Ross and he needed to be removed from Ross." (Bendolph Depo. at 108) Bendolph determined that if he was removed from Ross to another Level 3 prison, "his potential life-threatening situation would have been resolved." (Id.) However, Bendolph knew that the Aryan Brotherhood had members at the other prisons, including WCI, and a hit could follow a prisoner from one institution to another. (Id. at 52-53)

Hamilton did not challenge the denial of PC because he believed it would be futile. (Hamilton Depo. at 32) Hamilton thought: "I've did it in writing to the PC committees, I did it in writing to the central office. They had force of the whole penal system," and they had

denied his request. (Id.)

On December 17, 2003, Hamilton was transferred to Warren Correctional Institution ("WCI") and put into a rehabilitation program that limited his access to the yard and the general population. (Hamilton Depo. at 30) While in the program, Hamilton befriended an inmate named Sain. (Id. at 35-36) Sain was a "leprechaun," a member of the Aryan Brotherhood without any tattoos or identifying marks. (Id.) Hamilton claims that he did not know Sain was a member of the Aryan Brotherhood. (Id.)

When classes ended for the program, Hamilton was again allowed access to the yard and the general population at WCI. (Id.) On July 3, 2004, Hamilton was in the yard with Sain. Hamilton accepted Sain's offer to drink homemade alcohol called "hooch." (Id. at 33-34) Sain told Hamilton to go into the recreation shed and wait. (Id. at 36) Inside the shed were members of the Aryan Brotherhood, who attacked him. (Id. at 37-38) As a result of the attack, Hamilton's vision, hearing, his sense of smell, and his sense of taste are impaired. (Id. at 43, 45) Hamilton also suffers from severe headaches and mental health problems. (Id. at 46)

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). The moving party bears the

initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587. However, the nonmoving party may not rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

In ruling on a motion for summary judgment, "[a] district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). "Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Beatty v. UPS,* 267 F. Supp. 2d 823, 829 (S.D. Ohio 2003).

B.  **Section 1983**

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001), *citing Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998) and *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992).[2] There is

---

[2] 42 U.S.C. § 1983 provides:

no dispute between the parties that Defendants' acts constituted state action, but Defendants argue that Hamilton has not shown a constitutional violation. Moreover, Defendants maintain that they are entitled to qualified immunity from Hamilton's constitutional claims brought against them in their individual capacity.

### C. Qualified immunity

The doctrine of qualified immunity protects government officials performing discretionary functions from individual liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), *citing Procunier v. Navarette*, 434 U.S. 555, 565 (1978). Qualified immunity involves a two-step inquiry: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?;" (2) "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Hamilton claims that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.

---

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

### D. Eighth Amendment

In *Farmer v. Brennan*, the Supreme Court explained that the Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of prisoners, including protecting prisoners from violence at the hands of other prisoners. 511 U.S. 825, 832-33 (1994), *citing Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823 (1988). The Court explained: "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (citation omitted). However, the Court also explained that it is not "every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Instead, the Court explained that a prison official violates the Eighth Amendment only when two requirements are met. *Id.* This analysis has been described as being comprised of an objective and subjective component. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The first requirement, the Court explained, is that the alleged deprivation must be objectively "sufficiently serious." 511 U.S. at 834. The Court explained where the claims was based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a "substantial risk of serious harm." *Id.*

The Court explained that the second requirement is that the prison official has a "sufficient culpable state of mind." *Id.* The Court explained further that in prison-condition cases, the state of mind is one of "deliberate indifference" to inmate health or safety. *Id.* The Court then proceeded to define the proper test for deliberate indifference.

The Court stated that deliberate indifference was "more blameworthy than negligence," and a finding of liability requires "more than ordinary lack of due care for the prisoner's interests or safety." *Id., citing Whitley v. Albers*, 475 U.S. 312, 319 (1986). Nevertheless, the Court was clear that deliberate indifference is "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* The Court clarified that the context of a claim based upon prison conditions, "the standard of purposeful or knowing conduct is not . . . necessary to satisfy the *mens rea* requirement of deliberate indifference." *Id.* at 836.

The Court announced a subjective test for deliberate indifference, and held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The Court explained that under this test, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. The Court stated that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* As an example, the Court stated: if the plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison

officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842-83.

With regards to the issue of obvious risk, the Court explained: "That a trier of fact may infer knowledge from the obvious . . . does not mean that it must do so." *Id.* at 844. However, as the Court explained in a footnote: "While the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him . . . he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation . . . " *Id.* at 843 n.8. The Court explained that a prison official may escape liability by showing "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* In addition, the Court explained that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* As the Court explained: "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845.

This Court has quoted from the *Farmer* decision at some length because there

appears to be some confusion on the part of the parties as to what standards guide the Court's analysis. The Court will analyze the claims against Bendolph and Eleby separately.

### 1. Defendant Bendolph

The Court finds that Hamilton has shown under the first requirement that he was subjected to a substantial risk of serious harm. Whether Bendolph believed Hamilton was at risk is irrelevant under this prong of the Eighth Amendment analysis because it is an objective standard. *See Hudson*, 503 U.S. at 8 (explaining that the objective component requires a determination whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation."), *quoting Wilson v. Seiter*, 501 U.S. 294, 298 (1991). There is evidence in the record that Hamilton provided information which led to Daryl Bocook's conviction. It is logical that some sort of retaliation against Hamilton would follow. There is also evidence in the record that Hamilton had learned first-hand that the Bocooks had threatened his life, and he also received an anonymous letter threatening his life. Hamilton had been attacked by members of the Aryan Brotherhood before, and had been granted institutional separation from the Bocooks.

The Court now turns to the second requirement to determine whether Hamilton has presented evidence of a "sufficient culpable state of mind." The Court finds that there is a genuine issue of material fact as to whether Bendolph knew of a substantial risk of harm to Hamilton "from the very fact that the risk was obvious." Bendolph was presented with the PC Committee's investigative report, which the Court finds is evidence that the risk of an attack on Hamilton was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." The Court finds that these circumstances suggest that Bendolph "had been exposed to information concerning the risk and thus 'must have

known' about it." Based on this evidence, a trier of fact could find that Bendolph had actual knowledge of the risk of an attack on Hamilton.

However, as the Supreme Court cautioned, just because a trier of fact *may* infer knowledge from the obvious does not mean that it must do so. Indeed, Bendolph may escape liability by showing that he knew the underlying facts "but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."

Bendolph argues that he believed the risk of an attack on Hamilton was insubstantial or nonexistent because the report from the PC Committee noted that Paula Cremeans was on Hamilton's inmate visiting list, and the PC Committee believed that Hamilton sent the threatening letter to himself. However, despite these findings, the PC Committee recommended PC for Hamilton. This recommendation was approved by the warden, and his approval was before Bendolph as well. The Court finds that the Sixth Circuit's decision in *Woods v. Lecureux*, 110 F.3d 1215 (6th Cir. 1997) instructive on this point.

In *Woods*, the prisoner, Larry Billups, was murdered by members of a prison gang, the Melanics, while returning to his cell. *Id.* at 1217. Billups had only been recently transferred to the prison as the result of an "increased custody transfer." *Id.* at 1218. The transfer was ordered after Billups ended up on "the wrong side" of the leaders of the Melanics based on his involvement in an assault and robbery. *Id.* There was an investigation of the assault and robbery incident by a prison inspector, Erik Vink. *Id.* at 1223. Vink's findings were collected in a report. The "Vink Report" contained evidence that one of the other prisoners participating in the assault with Billups was stabbed the next day by the leaders of the Melanics, and the Melanics were angry at Billups as well. *Id.* The district court had granted the defendant's motion for judgment of law pursuant to Federal

Rule of Civil Procedure 50. *Id.* at 1281.

On appeal, the Sixth Circuit found that the "Vink Report" created a genuine issue of material fact as to whether the prison official, Art Tessmer, had knowledge of a substantial risk of serious harm facing Billups. *Id.* at 1223-24. The court explained:

> Tessmer contends the Vink Report was unreliable. He points to his testimony at trial that the report provided an insufficient basis for him to have taken specific action. In addition, Inspector Vink testified that two of the witnesses were not particularly credible. Tessmer's interpretation of the Vink Report is not unreasonable. Parts of the report are murky and other parts focus on issues unrelated to Billups. Indeed, Tessmer's interpretation of the Vink Report ultimately may prove to be correct. We are not allowed, however, to "weigh the evidence" or "evaluate the credibility of witnesses" when reviewing a motion for judgment as a matter of law.

*Id.* at 1223-24 (citations omitted). Tessmer had also argued that he was not deliberately indifferent because Billups had never disclosed any risk of harm to him. *Id.* at 1224. Similarly, Bendolph argues that Hamilton did not object to the transfer in lieu of PC, and Hamilton did not contest the issue in the six months after his transfer. However, as the court in *Woods* explained: "warnings from the prisoner himself are not required when other evidence discloses a substantial risk of harm." *Id.*, *citing Farmer*, 511 U.S. at 848 ("[T]he [prisoner's] failure to give advance notice [to prison officials] is not dispositive. Petitioner may establish respondents' awareness by reliance on any relevant evidence."). Accordingly, the Court concludes that there is a genuine issue of material fact as to whether Bendolph believed the risk to Hamilton was insubstantial or nonexistent. *See id*. (summary judgment is inappropriate when "there are issues of fact as to whether [a defendant in a § 1983/Eighth Amendment case] was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]' and whether he actually 'dr[e]w the inference.' "), *citing Street v. Corrections Corp. of Am.*, 102 F.3d 810,

816 (6th Cir. 1996).

In addition, Bendolph may be found free from liability if he responded reasonably to the risk, even if the harm to Hamilton was not averted. Bendolph determined that if Hamilton was removed from RCI to another Level 3 prison, "his potential life-threatening situation would have been resolved." The Court finds that there are genuine issues of material fact as to whether transferring Hamilton to another prison was a reasonable response. Bendolph knew the history of violence of the Aryan Brotherhood, and knew that the gang was present at the other prisons. Bendolph also knew that a hit could follow a prisoner to another prison. Moreover, if the source of the threat was the Bocooks, housing Hamilton at one prison versus the other made little difference, given the institutional separation in place. Therefore, the Court finds that at the summary judgment stage, Hamilton has presented sufficient evidence that Bendolph violated his Eighth Amendment right to be free from cruel and unusual punishments.

As to the second prong of the qualified immunity analysis, in *Farmer*, the Supreme Court held that a prisoner may bring a claim against a prison official, based on harm perpetrated by a fellow inmate, if the prison official acted deliberately indifferent "to inmate health and safety." *Flint ex rel. Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 355 (6th Cir. 2001). The Sixth Circuit has held that as of 1994, the year *Farmer* was decided, "it is without question that the right was clearly established." *Id.* Therefore, the Court finds that Bendolph is not entitled to qualified immunity from Hamilton's Eighth Amendment claim.

### 2. Defendant Eleby

Hamilton also alleges that Eleby has violated his Eighth Amendment rights for failing

to implement an operating procedure that delineated when to issue transfers instead of PC. Liability under section 1983 cannot be based on the doctrine of *respondeat superior*, or the right to control employees. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), *citing Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). For supervisory liability to attach, a plaintiff must prove that the official "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). A plaintiff must show that the official "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300.

Hamilton relies upon the Sixth Circuit's decision in *Taylor v. Michigan Dept. of Corrections*, 69 F.3d 76 (6th Cir. 1996), where a prisoner was raped after being transferred to another facility. The applicable regulations allowed the warden to delegate the authority to sign his name on transfers. *Id.* at 80. The warden testified that normally the deputy wardens of each complex could sign the transfers. *Id.* However, the warden testified that he was aware that his direct designees were redelegating his authority over transfers to lower echelon prison staff without any explicit authorization to do so; that he was not even sure of the procedures for approval of transfers; and that he had no review procedures to determine whether his authority was being abused. *Id.* The prison warden was "charged with abandoning the specific duties of his position--adopting and implementing an operating procedure that would require a review of the inmate's files before authorizing the transfers-- in the face of actual knowledge of a breakdown in the proper workings of the

department." *Id.* at 81. The court found that based on the warden's testimony, there was a genuine issue of material fact as to whether the operating procedures in reviewing and authorizing transfers were defective and that the warden was aware of his subordinates' failure to review prison files before authorizing a transfer. *Id.* at 80.

Here, Hamilton has not presented such evidence. There is no evidence that Eleby was unaware of the procedures for approving PC, or that he was not reviewing the decisions made by Bendolph and the other designee. Moreover, there is no evidence that Eleby was faced with actual knowledge of a breakdown in the PC review procedure or that Eleby was personally involved in some way. At the most, Hamilton has shown "evidence only that supervisors . . . failed to review their subordinate's work," which the Sixth Circuit has found to be insufficient to hold a supervisor liable. *Gregory v. Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). Therefore, Eleby is entitled to summary judgment on Hamilton's claim against him in his individual capacity.

### E. Official capacity claims

While not specifically addressed by the parties, Hamilton has brought claims against Bendolph and Eleby in their official capacity. Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978). Therefore, a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Brandon v. Holt*, 469 U.S. 464, 471 (1985). The State of Ohio has not waived its Eleventh Amendment immunity, and therefore a plaintiff cannot maintain a claim for damages against a state official in his or

her official capacity. *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992).³ However, the Eleventh Amendment is not a bar to injunctive relief. *Id.* Accordingly, Defendants are entitled to summary judgment on Hamilton's claim against them in their official capacity to the extent Hamilton is seeking money damages.

## III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Defendants William Eleby and Jack Bendolph's Motion for Summary Judgment (Doc. 37) is **GRANTED in PART and DENIED in PART**. The motion is GRANTED as to the claim against Defendant Eleby in his individual capacity and to the extent that Hamilton is seeking money damages from Defendants in their official capacity; the motion is DENIED in all other respects.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court

---

³The Sixth Circuit has instructed that the sovereign-immunity defense "may (and should) be raised by federal courts on their own initiative." *Nair v. Oakland County Community Mental Health Authority*, 443 F.3d 469, 474 (6th Cir. 2006), *citing Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 389 (1998).